1   **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

9   Hunter Alan Finkle,                    No.  CV 14-01343-PHX-DGC (JZB)

10                    Plaintiff,            **ORDER**

11   v.

12   Charles L. Ryan, et al.,

13                    Defendants.

14

15

16        Plaintiff Hunter Alan Finkle, who is currently confined in Arizona State Prison

17   Complex (ASPC)-Lewis, brought this civil rights case pursuant to 42 U.S.C. § 1983.

18   Doc. 1.  Defendants have filed a motion for summary judgment (Doc. 29), and Plaintiff

19   has not responded, although he was informed of his right and obligation to do so.[1]  Also

20   pending before the Court are the following motions: (1) Defendants' motion for summary

21   disposition (Doc. 36); (2) Plaintiff's "Motion to Sett[le] Out of Court with Defendants,

22   Protect My Name to Keep Anonymous from Public Eyes" (Doc. 37); and (3) Defendants'

23   motion to strike Plaintiff's motion to settle (Doc. 38).  For the following reasons, the

24

25        [1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d

26   952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response.  Doc. 31.
    The order required Plaintiff to file a response by September 21, 2015, and Plaintiff

27   requested an extension of time (Doc. 33), which the Court granted, allowing Plaintiff
    until November 19, 2015 to file a response.  Doc. 35.  Plaintiff did not file a response by

28   the extended deadline or request any further extensions of time.

1   Court will deny Defendants' motion for summary disposition, Plaintiff's motion to settle,
2   and Defendants' motion to strike.  The Court will grant Defendants' motion for summary
3   judgment and terminate this case.

4   **I.      Background.**

5          In his Complaint, Plaintiff alleged that Defendants violated his Eighth Amendment
6   rights by failing to place him in protective custody ("PC").   Plaintiff named as
7   Defendants Arizona Department of Corrections ("ADC") Director Charles Ryan, ADC
8   Security Administrator Keith Smith, and the following individuals at ASPC-Florence:
9   Warden Hetmer, Deputy Warden Fizer, Lieutenant Evans, Sergeant Brown, Sergeant
10  Norris, Sergeant Parker, and Dr. French.

11         Plaintiff alleged the following relevant facts.  In May or June 2007, while he was
12  incarcerated at the Yavapai County Jail, Plaintiff was questioned by a supervising officer
13  about another inmate, whom Plaintiff alleges bit the head off a bird and spit the head at a
14  sergeant.  Doc. 1 at 6, ¶ 4.  Plaintiff's statements to the officer aided in the prosecution of
15  that other inmate on animal cruelty charges.   *Id.*   After that, around June or July,
16  Plaintiff's two cellmates were told by another inmate to assault Plaintiff for "snitching"
17  on the other inmate.  *Id.*, ¶ 5.  Officers at the jail "realized that the Plaintiff was in further
18  danger after being assaulted due to being a 'snitch' and placed the Plaintiff in protective
19  custody."  *Id.*

20         Plaintiff was transferred later that year to ADC's custody.  *Id.* at 6-7, ¶ 6.  In June
21  2008, an inmate threatened to tell the Aryan Brotherhood prison gang that Plaintiff was a
22  "snitch" unless Plaintiff paid the inmate $20 every two weeks.  *Id.*  Plaintiff requested PC
23  a week later, but was denied.  *Id.* at 7, ¶ 7.  Between 2008 and June 17, 2014, when he
24  filed this lawsuit, Plaintiff requested and went through the PC process ten different times,
25  but was denied PC status each time.  *See id.* at 7-16.

26         Plaintiff seeks damages and injunctive relief in the form of an order to Defendants
27  "to cease and protect the Plaintiff . . . from further threats and physical violence."  *Id.* at
28  18.  On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated

an Eighth Amendment claim and directed Defendants Fizer, Norris, Parker, and Smith to answer the Complaint.  Doc. 5 at 1.  The Court dismissed the remaining claims and Defendants.  *Id.*

Defendants Fizer, Norris, Parker, and Smith now move for summary judgment, arguing that: (1) Plaintiff's claims for events prior to June 17, 2012 are time barred; (2) Defendants were not deliberately indifferent to Plaintiff's safety; (3) Plaintiff did not exhaust his administrative remedies against Norris and Parker; and (4) Defendants are entitled to qualified immunity.  *See* Doc. 29 at 9-16.

**II.    Summary Judgment Standard.**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted; emphasis in original); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record.[2] Fed. R. Civ. P. 56(c)(3).

**III.    Motion for Summary Disposition.**

In their motion for summary disposition, Defendants ask the Court to summarily grant their pending motion for summary judgment because Plaintiff failed to respond to their motion for summary judgment. *See* Doc. 36. Defendants rely on Local Rule of Civil Procedure 7.2(i), which provides that the Court may deem a party's failure to respond to a motion as consent to the granting of the motion. *Id.* at 2.

In *Heinemann v. Satterberg*, the Ninth Circuit clarified that a local rule permitting a district court to treat the lack of a response as consent to granting a motion does not apply to summary judgment motions. 731 F.3d 914, 917 (9th Cir. 2013) (finding that Western District of Washington Local Rule 7(b)(2) conflicts with Federal Rule of Civil Procedure 56 and cannot provide a valid basis for granting a motion for summary judgment).[3] If a summary judgment motion is unopposed, Rule 56 "authorizes the court

---

[2] Because Plaintiff did not respond to the summary judgment motion and is proceeding pro se, the Court must construe Plaintiff's verified complaint as an affidavit in opposition to summary judgment. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

[3] Western District of Washington Local Rule 7(b)(2) states that "[i]f a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit." *Heinemann*, 731 F.3d at 916.

1   to consider a fact as undisputed," but it does not permit the court to grant summary

2   judgment by default. *Id.* Indeed, under the summary judgment standard, if the moving

3   party fails to meet its initial burden of production, the opposing party need not produce

4   anything. *Nissan*, 210 F.3d at 1102-03.

5       The Court must therefore address Defendants' motion for summary judgment on

6   the merits, and Defendants' motion for summary disposition will be denied.

7   **IV.    Relevant Facts.**[4]

8       **A.    The Protective Custody Process.**

9       ADC inmates who need protection from other inmates may seek PC under

10  Department Order ("DO") 805. Doc. 30 at 1, ¶ 1. PC status offers inmates the greatest

11  degree of protection and inmates granted PC status are housed only with other PC

12  inmates. *Id.* at 2, ¶ 2. An alternative to PC status is "alternate placement," where an

13  inmate may be housed in the general population but away from other inmates who may

14  pose a threat. *Id.*, ¶ 3. Such alternate placement may include changes to cell block, bed

15  assignments, or prison unit. *Id.* An inmate who poses a threat to another inmate is placed

16  on a "Do Not House With" ("DNHW") list, which is included in the inmate's

17  computerized Adult Inmate Management System ("AIMS") file. *Id.*

18      An inmate seeking voluntary PC segregation begins the process with a written or

19  verbal request for protection, immediately after which the inmate is isolated in a safe,

20  reasonably secure area. *Id.*, ¶ 4. The Shift Commander is notified and she or he conducts

21  an initial inquiry to determine if the inmate requires PC review. *Id.* The Shift

22  Commander interviews the inmate using PC Security Initial Interview Form and sends

23  the PC packet to the Deputy Warden for informal review. *Id.*, ¶ 5. The Deputy Warden

24  reviews the information and determines if the inmate could be moved to another general

25  population location to resolve the problem or if the PC process should continue. *Id.* at 2-

26

27      [4] Because Plaintiff did not file a response to Defendants' motion for summary
    judgment or a controverting statement of facts, the Court construes Defendants' statement
28  of facts (Doc. 30) as undisputed unless specifically contradicted by an allegation in the
    complaint (Doc. 1).

3, ¶ 6.  If the PC process continues, the Deputy Warden documents the reasons why and sends the documents to the Corrections Officer ("CO") IV.  *Id.*  The CO IV and the Special Security Unit ("SSU") then review the case, gather facts, and document the results, which is then forwarded to the Deputy Warden.  *Id.* at 3, ¶ 7.  The Deputy Warden reviews the information, documents his findings on the Protective Custody Decision Worksheet, and makes a recommendation which is forwarded to the Protective Custody Administrator ("PCA").  *Id.*, ¶ 8.  The PCA or the Protective Custody Committee ("PCC") reviews the information and makes a final decision on whether a threat to the inmate exists.[5]  *Id.*, ¶ 9.  The decision is documented if it differs from the Deputy Warden's recommendation.  *Id.*  The Deputy Warden notifies the inmate of the PCA's or PCC's decision.  *Id.* at 3-4, ¶ 10.  The inmate may appeal the decision by submitting an Inmate Letter, which is sent to the Protective Custody Unit.  *Id.*  The Security Operations Administrator reviews the appeal and issues a response, which is final.  *Id.* at 4, ¶ 11.

## B.     Plaintiff's PC Requests.

Prior to June 17, 2012, Plaintiff requested PC on July 17, 2008, December 27, 2010, and March 4, 2012.  *Id.*, ¶ 12.  On each occasion, Plaintiff was placed into the PC process, and each time Plaintiff's PC request was denied.  *Id.*

Defendants do not provide any details of those three PC requests, but Plaintiff states in his complaint that in June 2008, an inmate named Ty Randell confronted him about being a "snitch" while they were both at the Yavapai County Jail and Randell threatened to tell the head of the Aryan Brotherhood prison gang about Plaintiff being a snitch unless Plaintiff paid him $20 every two weeks.  Doc. 1 at 6-7, ¶ 6.  A week later, Plaintiff requested PC and went through the ADC's PC process.  *Id.* at 7, ¶ 7.  Plaintiff was denied PC but Randell was added to Plaintiff's DNHW list.  *Id.*  According to Plaintiff, anyone who is known by other inmates to request the PC process under DO 805

---

[5] The PCC is chaired by the PCA; the Security Threat Group ("STG") Investigator and an Offender Services CO IV must participate in the PCC meeting.  Doc. 30 at 3, ¶ 9.

is labeled a "snitch" because the requesting inmate must give information to officers; therefore, anyone requesting PC faces the same threat as "snitches." *Id.*, ¶ 8.

In November 2010, Randell gained access to Plaintiff's cell block and told all the other inmates that Plaintiff was a snitch and had requested the 805 process, thereby "endangering the Plaintiff further." *Id.* at 8, ¶ 10. About a week later, on December 3, Plaintiff gave a letter to Defendants Fizer and Brown stating that he was in danger, was receiving threats, and needed the 805 process. *Id.* Fizer and Brown said they would put Plaintiff's letter in the "report box," but Plaintiff did not receive a response. *Id.* On December 15, Plaintiff asked Brown if he would be receiving a response to his letter, but Brown said he was going home in 20 minutes and "it was not his problem." *Id.*, ¶ 12. On December 24, 2010, Plaintiff was walking to his cell when an inmate named Randolph ran towards Plaintiff "to assault him and they began to fight." *Id.* at 9, ¶ 14. Plaintiff says Randolph was aware of Plaintiff's "issues" because of Randell. *Id.* According to Plaintiff, Brown failed to follow security protocol for the unit where this occurred, a level 5 maximum security facility, in which two inmates were not to be allowed out of their cells at the same time. *Id.* at 8, ¶ 13. Plaintiff asked Brown for the 805 process and Brown granted this request. *Id.* at 9, ¶ 15. Plaintiff was interviewed by SSU J. McCune on January 3, 2011, and Plaintiff explained the issues he was having, beginning with helping prosecute another inmate at the Yavapai County Jail. *Id.*, ¶ 16. Plaintiff was denied PC status on February 17, 2011, and his appeal was denied on March 2, 2011. *Id.*

At the request of Plaintiff or a family member,[6] Plaintiff underwent the PC process on June 19, 2012, January 17, 2013, and May 23, 2013. Doc. 30 at 4-6, ¶¶ 13, 20, 27. Each step of the PC process was completed. *Id.* at 4-7, ¶¶ 14-19, 21-32. At the end of each process, Deputy Warden Fizer recommended alternative placement for Plaintiff and

---

[6] Defendants state that Plaintiff's brother requested PC for Plaintiff (Doc. 30 at 4, ¶ 13), but a letter from ADC dated June 19, 2012 regarding Plaintiff's PC request was written to Ms. Jaime Finkle. Doc. 30-2 at 26.

1    to add inmates to Plaintiff's DNHW list.  *Id.* at 5-7, ¶¶ 17, 24, 30.  The PCA and STG

2    Investigator agreed with Fizer's recommendations each time, and the PCA approved

3    alternative placement.  *Id.*  Plaintiff appealed the decisions in each case, and Defendant

4    Smith denied Plaintiff's appeals and provided Plaintiff with the reasons for each denial.

5    *Id.* at 5-7, ¶¶ 18-19, 25-26, 31-32.

6         Plaintiff does not say in his Complaint why he requested PC placement on June

7    19, 2012, but in his Protective Segregation Inmate Statement, Plaintiff wrote that he was

8    a confidential informant at the Yavapai County Jail to help build an animal cruelty case

9    against his cellmate and was put in protective segregation there.  Doc. 30-2 at 30.

10   Plaintiff said that once he arrived at the prison, another inmate was forcing him to pay

11   him money to keep his mouth shut about Plaintiff "being a rat," and that Randell had

12   made everything bad for Plaintiff "with the whit[e] boys."  *Id.*  Following an

13   investigation by SSU, Fizer recommended alternative placement for Plaintiff, and wrote

14   that the SSU contacted the Yavapai County Jail and was told that Plaintiff was placed

15   into protective segregation there because Plaintiff claimed he told on his co-defendant,

16   not because of his statement concerning another inmate's animal cruelty case.  Docs. 30

17   at 5, ¶ 17; 30-2 at 41.[7]  After the PCA approved alternative placement, Plaintiff appealed,

18   and Smith denied Plaintiff's appeal, writing that Plaintiff's allegations "are self-reported

19   and unsubstantiated.  Appropriate [DNHW] Inmates have been added to your list.  You

20   were not threatened.  You were not assaulted."  Docs. 30 at 5, ¶ 19; 30-2 at 47.

21        Plaintiff alleges in his Complaint that he next sought PC on January 17, 2013 after

22   an inmate named "Dirt Bike" told Plaintiff that he could fix Plaintiff's issues if Plaintiff

23   would assault another inmate.  Doc. 1 at 10-11, ¶¶ 19-20.  Plaintiff agreed and Dirt Bike

24   gave Plaintiff a six-inch knife to use to stab the other inmate, telling Plaintiff that Plaintiff

25

26        [7] The Deputy Warden's name is redacted from the Protective Segregation

27   Decision Worksheet (Doc. 30-2 at 41); however, Smith, in his Declaration, says that
     Fizer is the person who recommended alternative placement, and for support Smith cites

28   to Attachment F, which includes the Protective Segregation Decision Worksheet.  *See*
     Doc. 30-1 at 6, ¶ 19.

would be killed if he did not follow through. *Id.* at 10.  Plaintiff did not follow through, and the next day he asked a floor officer for the 805 process. *Id.* at 11, ¶ 18.  Ten minutes later, SSU Nobel came to Plaintiff's cell and Plaintiff explained the threat against him and told the officer where the letter and knife were located in his cell. *Id.*  Plaintiff was then taken to the yard office where Evans "filled out the 805 process paperwork." *Id.*  Plaintiff says Fizer was there and told Plaintiff "[t]hanks for doing the right thing." *Id.*

After the SSU issued its report, Fizer made the recommendation for alternative placement and to add two inmates to Plaintiff's DNHW list.  Doc. 30 at 6, ¶ 24.  Fizer wrote in the Protective Segregation Decision Worksheet that Plaintiff claimed he "has had trouble with the Aryan Brotherhood for some time" and that the other inmate told him this "would square his issue with them." *Id.*; Doc. 30-2 at 67.[8]  Fizer said that the SSU could not validate Plaintiff's claim or verify that the inmate named by Plaintiff gave him the weapon or told Plaintiff to perform the assault. *Id.*  In addition to recommending alternative placement, Fizer recommended that inmates who were aware of Plaintiff's current PC request be put on Plaintiff's DNHW request. *Id.*  After the PCA approved the alternative placement, Plaintiff appealed, and Smith denied the appeal, writing there was no evidence to support "STG-Related issues," or "the existence of a state-wide threat," that Plaintiff's allegations "are self-reported and unsubstantiated," and that Plaintiff was not threatened or assaulted.  Docs. 30 at 6, ¶ 26; 30-3 at 2.

In his May 23, 2013 request for PC, Plaintiff wrote that his neighbor told him that the "white Boys" have Plaintiff "on shine" and were wanting to get him because he has a "snitch jack[e]t on" him and had requested PC.  Doc. 30-3 at 5.  After SSU issued its report, Fizer made his recommendation for alternative placement with two inmates added to Plaintiff's DNHW list. *Id.* at 17.  Fizer wrote that SSU was unable to confirm Plaintiff's statements of being threatened and that Plaintiff refused to provide any names

---

[8] Again, although the Deputy Warden's name is redacted from the Protective Segregation Decision Worksheet (Doc. 30-2 at 67), Smith cites to the document in his Declaration in which it says that Fizer is the person who recommended alternative placement. *See* Doc. 30-1 at 8, ¶ 26.

or produce evidence of a new issue with the exception of an inmate telling Plaintiff that other inmates wanted to assault Plaintiff.  *Id.*  After the PCA approved the alternative placement, Plaintiff appealed, and Smith denied the appeal, writing in a Memorandum dated July 15, 2013 that there was "no evidence to support the existence of a state-wide threat" and that Plaintiff's allegations "are self-reported and unsubstantiated."   Docs. 30 at 7, ¶ 32; 30-3 at 21.

Plaintiff states in his complaint that on or about August 19, 2013, he attempted suicide by hanging himself from a light fixture his cell, but the fixture broke.  Doc. 1 at 11, ¶ 23.  Plaintiff was then moved to the Kasson Unit 2-B-32.  *Id.*

On August 24, 2013, Plaintiff notified CO III Sauceda that an inmate named Ronald Doty was telling inmate "Mike" to shoot Plaintiff with a prison-made dart gun, and Plaintiff asked to be moved to CB7 so he could be behind a solid door.  *Id.* at 12, ¶ 24.  On August 28, Defendant Norris moved Plaintiff to CB7-G-6.  *Id.*, ¶ 25.  On September 27, 2013, CO II Castro told Plaintiff that she had received information that Plaintiff was going to be assaulted.  *Id.*, ¶ 26.  Castro walked Plaintiff to the yard office and told the lieutenant about the information she had and the lieutenant said he had received the same information on September 24 and had filed an Incident Report.  *Id.* Plaintiff told the lieutenant that he was on an Aryan Brotherhood list of people to be killed or assaulted, and it must be inmate Jeremy Weiler who was going to assault him. *Id.*  Plaintiff asked why he was not moved out of CB7 when the lieutenant learned of a viable threat, and the lieutenant responded that "stuff like that happened in prison," which caused Plaintiff extreme emotional distress.  *Id.*  Plaintiff said he could not go through the 805 process again and that he wanted to kill himself, which led to him being placed on suicide watch in the Kasson Unit.  *Id.*  Plaintiff alleges that "[d]eliberate indifference was shown in regards to known threats against the Plaintiff's safety and well-being."  *Id.*

On October 1, 2013, Plaintiff came off mental health watch, and the Shift Commander told Norris that Plaintiff was requesting the PC process.  Doc. 30 at 7, ¶ 33. Norris interviewed Plaintiff to begin the PC process, and Plaintiff told Norris that he had

previous issues with white inmates within the Aryan Brotherhood STG and he could not return to the general population.  *Id.* at 8, ¶ 34.  Plaintiff told Norris that he been denied PC several times because of this issue.  *Id.*  According to Norris, Plaintiff said he did not want to return to CB-7 but he would be comfortable housed in CB-4 or CB-5.  *Id.*  Norris gave Plaintiff the PC form to fill out while Norris investigated the issue over the next two-to-three hours.  *Id.*, ¶¶ 34-35.  Norris stated that on the PC form, Plaintiff outlined his prior PC requests and denials of his requests, but Plaintiff "did not identify any new threats or concerns."  *Id.*, ¶ 35.

Norris told Plaintiff that Warden Hetmer directed that Plaintiff would be housed in CB Kasson Wing 2.  *Id.*, ¶ 36.  Plaintiff told Norris that he would refuse to house in Kasson Wing 2 because there were Aryan Brotherhood inmates in that wing who might assault him and that he had previously entered the 805 process from Wing 2 where there were inmates on his DNHW list.  *Id.*, ¶ 37.  Norris investigated Plaintiff's claims and learned that Plaintiff had not been placed in the 805 process during his previous two stays in Wing 2 in the previous six months.  *Id.* at 9, ¶ 38.  Norris did not discover that Plaintiff had any DNHW issues with any inmates on Wing 2.  *Id.*

When Sergeant Parker arrived on duty, Norris briefed Parker on Plaintiff's concerns about being housed in Wing 2-B-19.  *Id.* at 9, ¶ 39.  Parker then questioned Plaintiff if he knew of any inmate in Wing 2 with whom Plaintiff had issues or had threatened Plaintiff in the past, and Plaintiff did not know of anyone.  *Id.*, ¶ 40.  Parker told Plaintiff that the claims and issues Plaintiff was raising now had been reviewed during his PC process that was finalized on July 25, 2013, and that Plaintiff was not providing any new information or new threats.  *Id.*, ¶ 41.  Norris then ordered Plaintiff to house in "2-B-19," and instructed Plaintiff to immediately advise any staff member if Plaintiff was threatened while in 2-B-19 and a formal 805 review would be initiated.  *Id.* at 9-10, ¶¶ 42-43.

Two months later, on November 27, 2013, Plaintiff requested PC after he was assaulted with a dart.  *Id.* at 12-13, ¶ 53.  Plaintiff wrote in his Protective Custody Inmate

Statement that he was coming out of his cell when another inmate stabbed him with a dart. Doc. 30-3 at 23. Plaintiff wrote that this occurred because he had requested PC and had a "snitch jack[e]t," and because he did not carry out a hit on January 17, 2013. *Id.* In addition to the Aryan Brotherhood, Plaintiff wrote that he now has issues with the Mexican Mafia. *Id.* Sergeant Mexin interviewed Plaintiff and sent the PC packet to Fizer. Doc. 30 at 12-13, ¶ 53. Associate Deputy Warden Burch, acting for Fizer, determined that a complete review was required and he recommended PC placement for Plaintiff. *Id.* at 13, ¶¶ 54-56. The PCC and STG disagreed with Burch's recommendation, and recommended alternative general population placement with two new inmates added to Plaintiff DNHW list. *Id.*, ¶ 57. The PCC reasoned that Plaintiff's issues were "self-reported and had not been verified," that his issue "appeared to be the result of his prior PC requests," that SSU "had not verified that a STG/CSG related issue existed," and Plaintiff was not on any hit list. *Id.* Plaintiff appealed the decision, and Smith denied the appeal because the investigation revealed: (1) "no evidence to support STG-related issues;" (2) "no evidence to support the existence of a state-wide threat;" (3) Plaintiff's allegations "were self-reported and unsubstantiated;" (4) appropriate DNHW inmates were added to Plaintiff's list; and (5) the PSC noted other maximum custody placement opportunities available to Plaintiff away from known DNHW inmates. *Id.* at 13-14, ¶ 59; Doc. 30-3 at 41.

Plaintiff again requested PC on January 27, 2014. Doc. 30 at 14, ¶ 60. Plaintiff wrote in his Protective Custody Inmate Statement that another inmate told him that he could "clean up [his] issue with the White Boys" if he would be willing stab someone on the east side of Building 4. Doc. 30-3 at 43. Plaintiff wrote that he felt if he does not go through with the hit, he could get stabbed or hurt at the next yard he is sent to. *Id.* Sergeant Eaton interviewed Plaintiff and forwarded the PC packet to Fizer. Doc. 30 at 14, ¶ 60. Associate Deputy Warden Burch reviewed the initial information, determined that a complete review was required, and again recommended PC placement for Plaintiff. *Id.*, ¶¶ 61, 63. The SSU reviewed the case and gathered pertinent facts and reported that

it was unable to confirm Plaintiff's statements that he was told to stab an inmate.  *Id.*, ¶ 62.  The SSU also found no new issues except for Plaintiff's report that another inmate told him he could "clean up his name" if he stabbed an inmate in CB4 East.  *Id.*  SSU reported that it was unable to confirm that Plaintiff was in PC in the county jail or told to assault another inmate.[9]  *Id.*  The PCC and STG disagreed with Burch's recommendation for PC placement, and recommended alternative general population placement with two new inmates added to Plaintiff's DNHW list.  *Id.* at 14-15, ¶ 64.  Plaintiff appealed, and Smith denied the appeal, writing that the investigation revealed "no evidence to support STG-related issues" or the "existence of a state-wide threat," that Plaintiff's allegations are "self-reported and unsubstantiated," and that Plaintiff was not assaulted.  Doc. 30-3 at 61.  Smith wrote that the PCC "cites there are other placement opportunities available for you away from known [DNHW] identified Inmates."  *Id.*

On May 30, 2014, the SSU received information regarding a threat to Plaintiff, and so SSU interviewed Plaintiff, who again requested PC.  Docs. 30 at 15, ¶ 67; *see* 30-3 at 63-72.  Plaintiff explains that SSU Officer Brass told him that he received information that the Aryan Brotherhood had a hit on Plaintiff's life.  Doc. 1 at 15, ¶¶ 35-36; *see also* Doc. 30-3 at 69-70.  On June 9, 2014, Fizer recommended that Plaintiff receive PC placement, and on June 19, 2014, the PCC and STG approved PC placement for Plaintiff.  Doc. 30 at 15, ¶¶ 68-69.

**V.    Analysis.**

    **A.    Statute of Limitations.**

Defendants argue first that Plaintiff's claims for events taking place before June 17, 2012 are time barred.  Doc. 29 at 9-10.

Section 1983 does not include its own statute of limitations.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  Therefore, federal courts apply the statute of

---

[9] Defendants do not explain why the SSU was unable to confirm in 2014 that Plaintiff was in PC in the county jail when Fizer wrote in 2012 that the SSU contacted the Yavapai County Jail and were told that Plaintiff was placed into protective segregation there.  *See* Doc. 30-2 at 41.

limitations governing personal injury claims in the forum state.  *Wilson v. Garcia*, 471 U.S. 261, 280 (1985); *TwoRivers*, 174 F.3d at 991.  In Arizona, the limitations period for personal injury claims is two years.  *TwoRivers*, 174 F.3d at 991; *see also* A.R.S. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues).

Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991.  Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *TwoRivers*, 174 F.3d at 991-92 (citation omitted); *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).

The Court must apply any state rule for tolling to actions brought under § 1983.  *Hardin v. Straub*, 490 U.S. 536, 544 (1989); *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000); *TwoRivers*, 174 F.3d at 992.  For example, under Arizona law, the limitation period is tolled during mandatory exhaustion of administrative remedies.  *See Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005); *Ariz. Dep't of Revenue v. Dougherty*, 29 P.3d 862, 869, ¶ 25 (Ariz. 2001); *Third & Catalina Assoc. v. City of Phx.*, 895 P.2d 115, 119 (Ariz. Ct. App. 1994); *see also* AR.S. § 12-821.01(C) (cause of action required by law or contract to be submitted to administrative review process does not accrue until process exhausted).

In this case, Plaintiff filed his complaint on June 17, 2014.  Therefore, absent a reason for tolling the statute of limitations, claims that accrued prior to June 17, 2012 are barred.  In his complaint, Plaintiff alleges that he applied for PC in 2008 and 2010 and was denied each time.  Doc. 1 at 7, 9, ¶¶ 7, 15.  Plaintiff does not say with whom he spoke during the PC process in 2008 or who denied him PC status at that time.  *See id.* at 7, ¶ 7.  As to his request in 2010, Plaintiff alleges that on December 3, 2010, he gave a letter to Fizer and Brown stating that he needed the PC process because he was receiving threats and felt he would be assaulted.  *Id.* at 8, ¶ 11.  Plaintiff states that he did not

receive a response to this letter, and when he asked Brown about it on December 15, Brown said it was not his problem. *Id.*, ¶ 12. Plaintiff alleged that Brown showed deliberate indifference toward his request for protection from a known threat. *Id.* Nine days later, Plaintiff says inmate Randolph ran towards him to assault him and they fought. *Id.* at 9, ¶ 14. Plaintiff alleged that Brown failed to follow security protocol for that unit by allowing two inmates out of their cells at the same time. *Id.* After that fight, Brown allowed Plaintiff to begin the PC process; Plaintiff was interviewed by SSU J. McCune on January 3, 2011, but his request and appeal were denied in February and March 2011. *Id.*, ¶¶ 15-16.

Brown was dismissed from this lawsuit on screening. Doc. 5 at 10. Therefore, the only remaining Defendant against whom Plaintiff made any allegation prior to June 17, 2012 is Fizer. That allegation is that Plaintiff gave Fizer a letter on December 3, 2010 asking to begin the PC process but Plaintiff did not receive a response to the letter. Defendants argue that Plaintiff has not alleged that Fizer violated his Eighth Amendment rights with respect to that letter, and that Plaintiff did in fact go through the PC process seven times after December 3, 2010. Doc. 29 at 9. To the extent Plaintiff contends that Fizer was deliberately indifferent to his safety due to the lack of response to the letter he says he gave Fizer on December 3, 2010, Plaintiff has not provided any evidence showing that the statute of limitations did not begin to run on that date or was tolled for any reason.

Accordingly, the Court finds that Plaintiff's claims for events occurring prior to June 17, 2012 are barred by the statute of limitations and will dismiss those claims.

**B.    Exhaustion.**

Defendants argue that Plaintiff did not exhaust his administrative remedies with respect to his claims against Norris and Parker; therefore, Plaintiff's claims against Norris and Parker should be dismissed for failure to exhaust. Doc. 29 at 13.

**1.    Legal Standard.**

Under the Prison Litigation Reform Act, a prisoner must exhaust "available"

administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown*, 422 F.3d at 934-35. The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at 1171.

### 2.      Facts Relevant to Exhaustion.

ADC DO 802 sets forth the ADC's grievance procedure that inmates must follow to exhaust their administrative remedies. Doc. 30 at 10, ¶ 44. Inmates may use the grievance process in DO 802 for issues related to their conditions of confinement such as

1    "property, staff, visitation, mail, food service, institutional procedures," medical care, and

2    religion.  *Id.*, ¶ 45.  There is a separate appeal process for other matters such as

3    disciplinary issues and classification.  *Id.*  During orientation, inmates are instructed on

4    how to use the grievance process, and a copy of DO 802 is available at each prison

5    facility's resource library and inmates may request assistance in using the process from

6    their assigned CO III.  *Id.*, ¶ 46.  Under DO 802, an inmate is required to "completely

7    exhaust" the grievance procedure before filing a lawsuit.  *Id.* at 11, ¶ 48.

8          Inmates are required to initiate the grievance process by attempting to resolve the

9    complaint informally.  *Id.*, ¶ 49(a).  If the inmate cannot resolve the complaint informally,

10   he may submit an Inmate Issue/Response form to the CO III in the unit within ten

11   workdays of the action that caused the complaint.  *Id.*  If the inmate is unable to resolve

12   the complaint at that stage, he may file a formal Inmate Grievance with the Grievance

13   Coordinator within five work days of receiving a response from the CO III.  *Id.*, ¶ 49(b).

14   The Grievance Coordinator logs and investigates the issue, and the Deputy Warden issues

15   a response to the grievance.  *Id.*  If the inmate receives an unfavorable response to his

16   formal grievance, he may appeal to the Warden within five work days of receiving the

17   response by filing an Inmate Grievance Appeal.  *Id.*, ¶ 49(c).  If the inmate receives an

18   unfavorable response from the Warden, the inmate may file an Inmate Grievance Appeal

19   to the ADC Director within five work days of receiving the Warden's response.  *Id.* at 12,

20   ¶ 49(d).  If an inmate exhausts his administrative remedies by appeal to the Director,

21   there will be a record of it in the Grievance Appeal Log and Grievance Appeal File at

22   ADC's Central Office.  *Id.*, ¶ 50.

23         Defendants submit the Declaration of ADC Hearing Office Cheryl Dossett, who

24   states that she reviewed the ADC Central Office Grievance Appeal Log for any informal

25   attempts by Plaintiff to resolve issues related to his claims for the period of January 2012

26   through August 13, 2015.  *Id.*, ¶ 51; 30-4 at 12, ¶ 11.  Dossett states that she looked for

27   any informal resolutions or Inmate Issue/Response forms that would have been filed

28   within 10 days of Norris and Parker's decision not to place Plaintiff in the 805 PC

process and order for Plaintiff to house in 2-B-19.  *Id.*  Dossett found no entries in the ADC Central Office Grievance Appeal Log showing that the Central Office had received any "Inmate Issue/Response, Form 916-P, from [Plaintiff] on or after October 1, 2013."[10] Docs. 30 at 12, ¶ 52; 30-4 at 13, ¶ 12.  According to Dossett, Plaintiff did not exhaust the ADC's administrative remedies available to him regarding his claims against Norris and Parker.  *Id.*

### 3. Discussion.

Defendants presented evidence to the Court showing that administrative remedies were available and Plaintiff failed to exhaust those administrative remedies.  Plaintiff was issued an order containing the customary warnings regarding his obligation to respond to the motion for summary judgment and the potential consequences for failing to do so. *See* Doc. 31.  He was specifically informed that if Defendants showed no genuine issue of material fact, this action would be dismissed unless he produced controverting evidence.  *Id.* at 2.  Plaintiff still failed to respond.  Thus, Plaintiff has not rebutted Defendants' evidence that Plaintiff did not file any grievances related to his claims against Norris and Parker.  In his complaint, Plaintiff did check the "yes" boxes on the complaint form asking if there were administrative remedies available, if he filed a request for administrative relief, and if he appealed his request for relief to the highest level.  *See* Doc. 1 at 5.  However, merely checking the boxes is insufficient to rebut Defendants' specific evidence that Plaintiff failed to exhaust his administrative remedies against Norris and Parker.  Indeed, Plaintiff's Complaint gives no indication of when Plaintiff may have filed a grievance, who he may have named in his grievance, or what he said in his grievance.

Because the evidence shows that Plaintiff did not file any informal or formal grievances or appeals related to his claims against Norris and Parker, and because Plaintiff has failed to present any controverting evidence to Defendants' motion or any

---

[10] October 1, 2013 is the date Norris ordered Plaintiff to house in 2-B-19.  Doc. 30 at 9, ¶ 42.

1    evidence demonstrating that the grievance process was effectively unavailable to him, the

2    Court will grant summary judgment to Norris and Parker based on Plaintiff's failure to

3    exhaust his available administrative remedies against them.  Norris and Parker will be

4    dismissed without prejudice.[11]

5           **C.**     **Eight Amendment Claim against Fizer and Smith.**

6               **1.**     **Eighth Amendment Legal Standard.**

7           The Eighth Amendment requires prison officials to take reasonable measures to

8    guarantee the safety of prisoners.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In

9    particular, prison officials have an affirmative duty "to protect prisoners from violence at

10   the hands of other prisoners."  *Id.* at 833 (quotation marks and citation omitted).  A prison

11   official's failure to protect inmates from attacks by other inmates violates the Eighth

12   Amendment only when two requirements are met: (1) the objective component, requiring

13   a prisoner to show that that "conditions pos[e] a substantial risk of serious harm;" and

14   (2) the subjective component, requiring a prisoner to show that the defendant was aware

15   of the risk and disregarded it.  *Id.* at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 297-98

16   (1991)).

17          In determining whether a deprivation is sufficiently serious to satisfy the objective

18   component of an Eighth Amendment claim, a court must consider the circumstances,

19   nature, and duration of the deprivation and determine whether they pose an intolerable

20   risk of serious harm.  *Farmer*, 511 U.S. at 834 (citing *Wilson*, 501 U.S. at 298).

21          With respect to the subjective component, the requisite state of mind depends on

22   the nature of the claim.  In prison conditions cases, including inmate safety, the necessary

23   state of mind is one of "deliberate indifference."  *See Farmer*, 511 U.S. at 834.  A prison

24   official is liable under the Eighth Amendment for failing to guarantee the safety of a

25   prisoner if the standard for criminal recklessness is met, i.e., the official knows of and

26

27        [11] Because the Court finds that the undisputed facts establish that Plaintiff failed to
exhaust his available administrative remedies against Norris and Parker, the Court will
28   not address Defendants' arguments that Norris and Parker did not violate Plaintiff's
constitutional rights or that they are entitled to qualified immunity.

disregards an excessive risk to inmate health or safety. *See id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. *Id.* at 835. Deliberate indifference is not shown by merely stating that a defendant should have known of a risk; "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" in violation the Eighth Amendment. *Id.* at 838. Moreover, a prison official who responds reasonably to a risk is not liable even if the harm ultimately is not averted. *Id.* at 844.

In the context of a failure-to-protect claim, however, deliberate indifference "does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault," but it does require that the official "have more than a mere suspicion that an attack will occur." *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citations omitted).

Where the plaintiff seeks only injunctive relief to prevent a substantial risk of serious injury from becoming actual harm, the deliberate indifference determination is based on the defendant's current conduct. *Farmer*, 511 U.S. at 845. Thus, to survive summary judgment, the plaintiff "must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so."[12] *Id.* at 845-46.

### 2. Discussion.

#### a. Objective Component.

Defendants present no argument as to the objective prong. As mentioned, where

---

[12] It appears that Plaintiff's request for injunctive relief is moot because he is now in PC.

1   the movant fails to carry its initial burden, "the nonmoving party has no obligation to

2   produce anything, even if the nonmoving party would have the ultimate burden of

3   persuasion at trial." *Nissan*, 210 F.3d at 1102-03.  Nonetheless, there is no dispute that

4   Plaintiff was hit with a dart by another inmate and that Defendants received a threat to

5   Plaintiff's safety on or around May 30, 2014.  These facts alone raise a genuine issue of

6   material fact whether Plaintiff was subjected to a sufficiently serious risk of harm.

7                      **b.       Subjective Component.**

8          The subjective inquiry involves two parts.  First, Plaintiff "must demonstrate that

9   the risk was obvious or provide other circumstantial or direct evidence that [Fizer and

10  Smith] were aware of the substantial risk to [Plaintiff's] safety." *Lemire v. Cal. Dep't of*

11  *Corrs. and Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (citing *Thomas v. Ponder*, 611

12  F.3d 1144, 1150 (9th Cir. 2010)); *see Farmer*, 511 U.S. at 842 (whether a prison official

13  knew of a substantial risk "is a question of fact subject to demonstration in the usual

14  ways, including inference from circumstantial evidence, and a factfinder may conclude

15  that a prison official knew of a substantial risk from the very fact that the risk was

16  obvious") (citation omitted).  A prisoner may face a substantial risk of inmate attack

17  either "for reasons personal to him or because all prisoners in his situation face such a

18  risk."  *Farmer*, 511 U.S. at 843.  Second, Plaintiff "must show that there was no

19  reasonable justification for exposing [him] to the risk." *Lemire*, 726 F.3d at 1078.  The

20  Ninth Circuit has stated that these two inquiries "are fact-intensive and typically should

21  not be resolved at the summary judgment stage." *Id.*

22                      **i.       Substantial Risk.**

23         Defendants do not address this prong of the subjective component.  Courts have

24  found that inmates recognized as "snitches" are in danger in the general prison population

25  and prison officials may have a duty to protect those inmates. *See, e.g., Gullatte v. Potts*,

26  654 F.2d 1007 (5th Cir. 1981); *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir. 1997)

27  (finding that a prisoner's cooperation with prison officials and subsequent branding as a

28  "snitch" could lead to an inference that a prison official knew of a threat to the prisoner's

1    safety); *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995) (recognizing that a factfinder

2    could conclude that a risk to an inmate was obvious when it was known the inmate had

3    testified for the prosecution in a murder case).

4          The record reflects that during Plaintiff's June 2012 PC process, Plaintiff wrote

5    about being a confidential informant at the Yavapai County Jail and placed in protective

6    segregation there; he also wrote that after he arrived in prison, an inmate was demanding

7    Plaintiff pay him money to keep his mouth shut about Plaintiff "being a rat."  Doc. 30-2

8    at 30.  Fizer, in his recommendation for alternative placement, wrote on July 9, 2012 that

9    the SSU contacted the Yavapai County Jail and were told Plaintiff had been in protective

10   segregation there.  *Id.* at 41.  After Plaintiff's PC request was denied, Plaintiff wrote in

11   his appeal about being in protective segregation while in jail, and Smith denied Plaintiff's

12   appeal on September 13, 2012.  *Id.* at 44-45, 47.  Fizer and Smith were also involved in

13   Plaintiff's subsequent requests for the PC process, in which Plaintiff again wrote about

14   the events at the Yavapai County Jail, threats from certain inmates, and from the Aryan

15   Brotherhood. *See, e.g.*, Docs. 1 at 10-11; 30-2 at 67; 30-3 at 2, 5, 17, 21, 41, 61.

16         Based on this record, there is a question of fact whether Fizer and Smith were

17   aware of a substantial risk to Plaintiff's safety.

18                        **ii.    Reasonable Justification.**

19         Analysis of the subjective prong next requires the Court to examine whether there

20   was any reasonable justification for exposing Plaintiff to the risk and whether Fizer and

21   Smith responded reasonably to the risk.  *See Lemire*, 726 F.3d at 1078.   Deliberate

22   indifference is evaluated in this context by considering "whether, in allegedly exposing

23   the prisoner to danger, the defendant prison official(s) were guided by considerations of

24   safety to other inmates, whether the official(s) took 'prophylactic or preventive measures'

25   to protect the prisoner, and whether less dangerous alternatives were in fact available."

26   *Berg*, 794 F.2d at 462 (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).  "Prison

27   administrators therefore should be accorded wide-ranging deference in the adoption and

28   execution of policies and practices that in their judgment are needed to preserve internal

order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).   In *Berg*, the Ninth Circuit affirmed summary judgment for prison officials who investigated a threat to the inmate's safety, stating that "[i]f the evidence only involves a dispute over the . . . existence of arguably superior alternatives . . . the plaintiff has not met his burden and the case should not be presented to a jury."   794 F.2d at 462.   Likewise, in *Slone v. Arizona Department of Corrections*, the Ninth Circuit affirmed summary judgment against an inmate who claimed that the defendants acted with deliberate indifference because they denied his protective segregation request "when they investigated his requests and transferred him to a different prison unit as an alternative to placing him in protective segregation."   308 Fed. App'x 110, 111 (9th Cir. 2009) (citation omitted).

In this case, Defendants have presented evidence regarding the steps taken in the DO 805 PC process before a final determination is made on whether to place an inmate in PC.   *See* Doc. 30 at 2-4, ¶¶ 4-11.   Defendants also presented evidence of alternatives to PC placement such as changes to an inmate's cell block, bed assignment, or prison unit and adding an inmate to another inmate's DNHW list.   *Id.* at 2, ¶¶ 2-3.   The evidence reflects that Plaintiff requested PC seven times between June 19, 2012 and May 30, 2014, with Plaintiff finally being approved for PC on June 19, 2014.   *Id.* at 4-7, 12, 14-15, ¶¶ 13, 20, 27, 33, 53, 60, 67.   Defendants have presented evidence showing that each of Plaintiff's PC requests was investigated under the DO 805 process.   *Id.* at 4-10, 12-15, ¶¶ 13-19, 21-24, 28-29, 34-35, 38-43, 53-57, 61-66.   In each instance prior to June 19, 2014, Plaintiff was denied PC but was given alternative placement with inmates added to his DNHW list.   Defendants have, therefore, met their burden of demonstrating the absence of a genuine issue of material fact by submitting evidence that they responded reasonably to any threats by investigating Plaintiff's PC requests and choosing alternative measures to protect Plaintiff.   Once ADC officials determined that a credible threat against Plaintiff existed, Plaintiff was placed into PC.   Plaintiff has not rebutted this evidence to demonstrate the existence of a factual dispute supporting that Defendants did

not respond reasonably or were deliberately indifferent to a substantial risk of serious harm.

Accordingly, the Court will grant summary judgment to Fizer and Smith.

**VI.    Plaintiff's Motion to Settle and Defendants' Motion to Strike.**

Two months after a response to Defendants' motion for summary judgment was due, Plaintiff, on January 19, 2016, filed his "Motion to Sett[le] Out of Court with Defendants; Protect My Name to Keep Anonymous from Public Eyes" (Doc. 37). Plaintiff states that he is asking for the Court's help in having ADC put a "max hold" on Plaintiff "going to a[n] open yard" and to keep Plaintiff in "Rast max in a single man cell for the remainder of his prison sentence." *Id.* at 1.  Plaintiff also asks that the Court and the Defendants put a "protective[e] order on this lawsuit" and to keep his name "anonymous from the public eyes" for his safety. *Id.*

In their motion to strike Plaintiff's motion to settle, Defendants assert that Plaintiff's motion is not a proper motion and "is actually a settlement proposal which Plaintiff mailed to Defendants" and filed with the Court.  Doc. 38 at 1.  Even if Plaintiff did mail the same request to Defendants as a settlement proposal, Plaintiff's motion is nevertheless a motion in that he states in writing the relief he is seeking from the Court. *See* Fed. R. Civ. P. 7(b)(1).  Therefore, Defendants' motion to strike will be denied.

As to Plaintiff's request in his motion to have a "max hold" placed on him, Plaintiff did not present evidence that he is currently in danger of being moved to an open yard and so his claim appears speculative.  If in the future Plaintiff has evidence that he has been or will be moved to an open yard and fears for his safety, then he may file a new lawsuit.

As to Plaintiff's apparent request to seal either the entire Court record or certain documents in the record, the Court notes that Plaintiff filed this lawsuit nearly two years ago and all filings have been matters of public record since its inception.  Plaintiff should be aware that the public has a right to inspect judicial documents and records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  However, such a right is not

absolute.   Nevertheless, there is a strong presumption in favor of access to judicial records.   A party seeking to seal a judicial record bears the burden of overcoming this presumption by either meeting the "compelling reasons" standard if the record is a dispositive pleading, or the "good cause" standard if the record is a non-dispositive pleading.  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006). Moreover, the policy of promoting access to public documents dictates that only that information which there is good cause or a compelling reason to seal should actually be sealed.   Accordingly, to the extent a party wishes to seal an entire document, rather than redacting certain secret information from that document, the party must provide either good cause or compelling reasons to seal all of the information in that document.  *See id*. at 1183.   Otherwise, the party must only seek to redact that information for which there is good cause or compelling reasons to seal.

In this case, Plaintiff has not provided either compelling reasons or good cause to seal documents that are already part of the public record.  Plaintiff merely says he "would like to keep [his] name anonymous from the public eyes, and for my saf[e]ty from being put in more danger."  Doc. 37 at 1.  This conclusory reason is insufficient for sealing any part of the record.  Accordingly, Plaintiff's motion will be denied.

**IT IS ORDERED:**

1.     The reference to the Magistrate Judge is withdrawn as to Defendants' motion for summary judgment (Doc. 29), Defendants' motion for summary disposition (Doc. 36), Plaintiff's "Motion to Settle Out of Court with Defendants; Protect My Name to Keep Anonymous from Public Eyes" (Doc. 37), and Defendants' motion to strike Plaintiff's motion to settle (Doc. 38).

2.     Defendants' motion for summary disposition (Doc. 36) is **denied**.

3.     Plaintiff's "Motion to Settle Out of Court with Defendants; Protect My Name to Keep Anonymous from Public Eyes" (Doc. 37) is **denied**.

4.     Defendants' motion to strike Plaintiff's motion to settle (Doc. 38) is **denied**.

5.      Defendants' motion for summary judgment (Doc. 29) is **granted** as follows:

a.      Defendants Norris and Parker are **dismissed without prejudice** for Plaintiff's failure to exhaust administrative remedies prior to the commencement of suit.

b.      Defendants Fizer and Smith are **dismissed with prejudice**.

6.      This action is dismissed.   The Clerk of Court must enter judgment accordingly.

Dated this 30th day of March, 2016.

_____
David G. Campbell
United States District Judge